## IDEAL JEWELRY CO. v. PAYTON.

(District Court, D. Rhode Island. July 16, 1924.)

No. 175.

1. **Patents ⬡⟳328—1,467,468, for flexible bracelet, held valid and infringed.**
   The Blanchard patent, No. 1,467,468, for a flexible bracelet, *held* valid and infringed.

2. **Patents ⬡⟳62—Anticipation must be proved beyond reasonable doubt.**
   The defense of anticipation by prior manufacture and sale of the patented article by another must be established by tangible evidence beyond a reasonable doubt.

In Equity. Suit by the Ideal Jewelry Company against Harry Payton. Decree for complainant.

Perley H. Plant, of Providence, R. I., for plaintiff.
Joseph T. Brennan, of Boston, Mass., and Herbert Barlow, of Providence, R. I., for defendant.

BROWN, District Judge. The bill in equity charges infringement of letters patent No. 1,467,468 to Adna F. Blanchard, assignor, to Ideal Jewelry Manufacturing Company, dated September 11, 1923, application filed November 19, 1920, for flexible bracelet.
Claims 1 to 5, inclusive, are in suit.
[1] Claim 5 is as follows:

"5. In a bracelet, a plurality of connected links each comprising a pair of co-operating members nested together, one of said members being provided with a gem-exposing opening, means for supporting a gem between said co-operating members in position to seat against and be held against removal by the edge of said gem-exposing opening, a connecting head carried by one of said members and positioned between the co-operating members of the next succeeding link, and means for securing each pair of co-operating members together to hold them against separation and at the same time hold the connecting head of the next succeeding link against removal."

The specification states:

"It is an especially important aim of the invention to enable the production of bracelet units with a small number of parts, involving few machine and stamping operations. It is an important attainment of the invention that the setting of gems may be rapid and involve a minimum expenditure for labor and machine operations."

An improved gem setting adapted to be formed integrally with the structural parts of the bracelet units, and a novel form of link connection between the units of a bracelet, are also features referred to in the specification. The bill also charges unfair competition.

The principal defense is that the patent in suit is void because the patentee was not the original and first inventor of the thing patented. The defendant has introduced evidence tending to show actual reduction to practice and sales of its completed bracelet on July 8, 9, 1920.

The plaintiff disputes this evidence, and contends that the defendant's first production and sale was in April, 1921.

An examination of the patent in suit, and of the exhibits of bracelets manufactured by the plaintiff and defendant, makes it seem high-

⬡⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ly improbable that this invention was independently produced by two inventors, at or about the same time, and much more probable that one of the parties copied from the other.

The conception of an improved gem setting formed integrally with a structural part is shown very clearly in Figure 7 of the patent in suit, which illustrates a single blank with a gem seat, a connecting link, and a triangular opening to permit the insertion of the T-shaped head of the link in the plane of the hypotenuse of the triangular opening.

The defendant, Payton, says of the plaintiff's device:

"They improved upon our construction. Our box was made out of three pieces; theirs was made out of two."

But the plaintiff's blank, Figure 7, is proof of something more than mechanical skill. When this blank is bent into box form, the gem placed in the seat, and the outer box placed over it and its lower sides bent under, there results a structure which displays invention as well as mechanical skill. Apparently this is the work of an inventor rather than of a copyist. There is, however, no evidence to show that during the period of production either party had knowledge of the device of the other prior to November 19, 1920, the date of application for the patent in suit.

The defendant produced oral evidence to the effect that Joseph Herschoff, formerly a partner of the defendant, Payton, from March 15, 1920, to June, 1923, thought out the construction in December, 1919, described it orally to Payton in February, 1920, and on March 15, 1920, was taken into partnership with Payton. He made no samples or models until shortly after entering into partnership with Payton; that Herschoff then himself made samples, and some time in May, 1920, gave them to a tool maker, J. & L. Tool Company, Attleboro, Mass., who never returned them; that the tools were completed and delivered to H. Payton in the last part of June, and they "started right away to work on them." He was asked, "How long after you made these bracelets did you get them on the market?" and replied:

"It took a few weeks: I couldn't tell you exactly when we put them in the market, because I didn't take any interest in the selling; my interest was in the factory."

He testified that the number given the first bracelet was 304, and that it was a double-strand bracelet; also that the single strand bracelet was sold under number 325.

The plaintiff introduces evidence from defendant's records of sales that the single strand bracelet, "325," was first sold on April 12, 1921, to Gimbel Bros., New York City, at the price of $18.60 per dozen, and contends that this is the first entry in defendant's books of its sale of the infringing device, and argues that it is highly improbable that the defendant's sales, recorded under No. 304, related to the infringing device. The plaintiff offers testimony of Max Rosenthal, formerly employed by the defendant, that the bracelet sold under No. 304 was a bracelet of different construction made by H. Payton, and was in infringement of the Walkenheimer patent, illustrated by Plaintiff's Exhibit No. 11. It appears in evidence that the defendant was manufacturing this device without license from the patentee. The defend-

ant testified that he sold this Walkenheimer bracelet under No. 300 on June 24, 1920. It appears, therefore, that at about the time he claims to have been producing the bracelet upon which he relies as an anticipation of the patent in suit, he was manufacturing a single strand flexible bracelet, which in general appearance, when worn, closely resembled the bracelet of the patent in suit. In fact, the general appearance of the plaintiff's bracelet was not new. Flexible bracelets of box-shaped units, in which a gem was set, were familiar in the trade, having been on the market for about ten years.

From Defendant's Exhibit No. 13 (sales sheets) it appears that on July 2 he sold, under No. 300, 2 dozen bracelets at $21 per dozen; that on the same date he sold bracelets under Nos. 301 and 302 at $21 and $18 per dozen, respectively; on July 7, 1920, 7 dozen bracelets, No. 300, at $21; on July 8, 1920, one-fourth dozen No. 304, at $36; single bracelets, No. 304, to four customers at $36, $42, and $43.75 per dozen. Other sales of No. 304 followed. Apparently some of these bracelets were sent out as samples. None of these customers has appeared as a witness to testify as to the character of the bracelet bought by him. The defendant's testimony was to the effect that Herschoff, before entering into partnership with Payton, explained to him the construction of the bracelet, and that upon the disclosure of the idea Payton agreed to take Herschoff into partnership. This partnership was formed on March 15th, 1920.

It is, however, a most significant fact that according to Payton's own testimony the manufacture of the Walkenheimer bracelet, a patented structure, was begun immediately after the formation of the partnership, and at about the same time assigned by defendants to beginning the manufacture of the infringing bracelet—i. e., in March, April or May, 1920. He estimates that he sold about 1,000 of the Walkenheimer bracelets.

A comparison of the Walkenheimer bracelet with the infringing bracelet raises a very serious doubt as to whether Payton and Herschoff could have had any knowledge or conception of the construction of the infringing bracelet, when they decided to make the Walkenheimer bracelet without license from the patentee, Walkenheimer. The fact that they did engage in the manufacture of this bracelet affords very strong evidence that they did not then have any knowledge of the device of the patent in suit. The great advantage of the patented structure is that the setting of the gems from the back is rapid. They are dropped into the interior gem holder, and are firmly held between the lower and upper box when the unit is assembled. Furthermore, the linking together of the units is an operation requiring merely a simple manipulation.

The Walkenheimer device requires that the stones be set from the front, in the more expensive way. If the disclosure by Herschoff to Payton of the advantages of the infringing device was an inducement to take him into partnership, why forego these advantages by making the more expensive Walkenheimer device?

Considering the plaintiff's record of sales, it is remarkable that the first record of a sale of the single strand bracelet like plaintiff's was on April 12, 1921. Several variations of this type of bracelet were sold

under the successive Nos. 326, 327, 328. As the single strand must have been produced before making the double strand bracelet, we should naturally expect to find a succession of numbers. We find that 300, 301, 302, were sold about the same time, whatever the construction of that bracelet. Yet we find a gap of 21 numbers, and a lapse of about nine months, between the sales of 304 and the sale of 325, which must have been completed before 304 was made by combining two 325 strands.

Rosenthal testifies that he worked on the Walkenheimer bracelet in 1920, setting the stones from the outside, and that the number applied to that bracelet was 304.

As the mode of setting the stones from the back in the device of the patent in suit is much cheaper than that shown in the Walkenheimer device, which requires the stones to be set from the front, and as it appears that the defendant's device is in other respects of cheaper construction than the plaintiff's, we should expect to find a reduction of price after the adoption of the cheaper plan of manufacture. No. 325 is listed at $18.60; whereas, as we have seen, the prices of 304 were much higher.

The difficulty with defendant's book entries as evidence of anticipation is that they are not self-supporting, because oral evidence only is relied upon to give meaning to the numbers appearing in the books, and this evidence is not only contradicted, but calls for explanation of the fact that what must have been the earliest production is latest in book number and time. The defendant also relies upon evidence as to the ordering and completion of tools for the manufacture of the infringing bracelet.

He offers no evidence, however, as to the ordering of tools or machinery for the manufacture of the Walkenheimer bracelet, which obviously requires machine operations, and there arises therefore a serious doubt as to whether the records of the tool maker relate to devices for the manufacture of the Walkenheimer bracelet or to devices for the manufacture of the infringing bracelet.

The strongest evidence for the defendant is the testimony of Emil L. Johnson of the J & L Tool Company, of Attleboro. His testimony, supported by his books, leaves little doubt that his concern manufactured between May 26, 1920, and June 28, 1920, tools for a flexible bracelet. His books, however, give no description of what kind of a flexible bracelet it was. Though the defendant contends that the manufacture of tools by the J & L Tool Company was merely for the infringing bracelet, and though Payton denies that the J & L Tool Company had anything to do with the manufacture of the machines or tools for the Walkenheimer device, the witness gives testimony which indicates that work was done by the J & L Tool Company on both the Walkenheimer bracelet and the bracelet of the patent in suit.

The books of the J & L Tool Company show no delivery to the defendant of separate cups or boxes during the year 1920, but that during the earlier part of the work in 1920 they billed to the defendant "bracelets"—July 8, 90; July 9, 110; July 13, 88; July 15, 94; July 22, 68—i. e., on these dates a total of 450 bracelets. The witness testified: "We put together a certain number of boxes." His books show

no delivery in 1920 of what he terms cups for flexible bracelets; being asked to find such entries he replied:

"I know I cannot, because I explained previously that we put together—we assembled—the bracelets to start with, and that about a year later he wanted the tools to make them himself, and he had the tools there for about ———."

His books disclosed that in October and November, 1921, bills for "cups for flexible bracelets" were rendered to Payton.

It appears that, whatever the structure, he first assembled the bracelets, except the end pieces which held the catches, but later made the cups and sold them at so much a gross.

In view of the fact that the exterior box of the infringing device cannot be applied until after the gem is placed in the interior gem setting, and that the outer box is slid over and clamped under the interior gem seat, it is not clear how the J & L Tool Company, in the first instance, could have carried the work of assembling the alleged infringing device to any permanent form, or why Payton did not in the first place do what he did later, receive the outer boxes separately, since they could not be applied until after both the gem seat and the gems were placed in position. Though it appears that the Walkenheimer boxes, into which the gems were set from the front, could be usefully and permanently assembled by the J & L Tool Company, it has not been shown how it was possible to do this with the telescopic form of gem setting, in which the gem is held between the inner and outer members.

The witness Johnson stated:

"There were some heavy boxes which made a flexible bracelet that we made the drums for and I believe perforated cutters. It was partly—they were partly finished. * * *"

The evidence that separate boxes were not supplied to Payton until 1921 raises a serious doubt whether the witness has not confused work which was done by the J & L Tool Company on the Walkenheimer or some other bracelet in 1920 with work subsequently done on the infringing device in 1921.

Positive testimony that the Walkenheimer bracelet was the bracelet made in 1920, and was numbered 304, required rebuttal evidence from the defendant, which should remove all doubt upon that question. No such evidence has been introduced.

While Johnson testified at first from recollection that he made but one set of tools for flexible bracelets, and produced certain parts (Exhibit D) made experimentally in production of tools for the infringing device, he gives definite testimony that in the first stages of manufacture the J & L Tool Company had in its possession the tools for making the boxes and assembling factors and made up and sold to Payton the middle portion of the bracelet, all but the end pieces and the catches.

It also appeared on cross-examination and reference to his books that after January 3, 1921, various orders from Payton for tools for flexible bracelets were received, and were filled in February, April, May, and June, 1921. He was asked on cross-examination:

"Q. You made up lots of different tools for him didn't you?
"Ans. Yes; we did."

The uncertainty as to whether the book entries of the defendant's sales relate to the Walkenheimer or to the infringing bracelet also exists as to the book entries of the tool maker. Aside from oral explanation, both sets of entries may relate to either the Walkenheimer bracelet or the infringing bracelet.

The defendant produced also three exhibits of double strand bracelets from persons who testified that they procured these bracelets from Payton in July or August, 1920. Max Gertsacov, a dealer in job lots of jewelry, produced his cashbook showing that on July 7, 1920, he purchased from Payton for $250 a job lot, which he says included between 32 and 34 bracelets; the one which he produced being in that job lot, and having been sold by him to a New York customer, who sent it back broken. The defendant has no record of this sale. As the tools for making these bracelets were not billed to Payton until June 28, 1920, the date of July 7 seems very early for the accumulation of a job lot of bracelets. As the witness testified to the purchase of "quite a good many different lots" since 1920, little dependence can be placed upon his recollection of the date of acquiring this exhibit. The defendant also called as a witness Charles C. Brown, "related to the defendant by marriage" (the plaintiff says his son-in-law), who produced a double strand bracelet, Exhibit H, which he says he procured from Payton in the latter part of July, 1920, as a present for his wife, who was staying at the Fabian House in the White Mountains. He fixes the date by a check dated August 19, 1920, by which he paid his hotel bill. The defendant also produces as a witness Thomas F. O'Donnell, who has supplied Payton with material ever since Payton has been in business. He produced a double strand bracelet which he says he took from Payton's shop about the last of July or the first of August, 1920, and that it has ever since been in the possession of his wife. He says he took it without asking. Defendant's Exhibit G. O'Donnell fixes the date as the last of July or the first of August, 1920. He testifies as to the preparation of silver for the boxes, refers to a sale of silver to Payton on June 22, 1920, and states that he helped Payton out in preparing silver of the right sizes and temper to prevent cracking. He was asked as to his getting a sample of the double strand bracelet. and replied:

"Q. How did you come to get it from Mr. Payton?
"A. Mr. Payton was working on the tools, and I said, 'When you get through with this, I wish to have one for my wife.' I didn't ask him this wish. About a month after I took one."

The testimony as to the dates of these exhibits, however, is not from disinterested persons, and is not sufficient to remove the doubt whether the defendant did produce a double strand infringing bracelet during the same period in which he was making the Walkenheimer bracelet and nine months before his first production and sale of the single strand bracelet, No. 325, on April 12, 1921.

This testimony, however, is directly inconsistent with the testimony of two persons, who were employed by H. Payton & Co., and who testified specifically that the infringing bracelet was not produced at any time during 1920.

John B. Gazarra, a bench hand employed by Payton in 1920, and who continued in his employment over three years, testified that he at first worked on the Walkenheimer bracelet, and that none of the infringing bracelets was made in that shop in the year 1920; that the shop employed 12 to 15 men and 2 or 3 women. He states specifically that he was the man who began the manufacture of the infringing bracelet in 1921; that Herschoff instructed him how to draw a box, and saw the pieces; and that when he had prepared the boxes and pieces Herschoff came and made the first one. "I put it up myself; he showed me how to do it, and he give me charge of a couple of girls." Max Rosenthal, a stone setter, also testifies to working on the Walkenheimer bracelets in 1920, that it was known as No. 304, and that the infringing bracelets were not made until 1921.

The testimony of these workmen as to the time at which the work was done cannot be attributed to confusion of memory, and can be rejected only on the ground of deliberate fabrication. If it is true, the three exhibits of double strand bracelets were not in existence until after the application date, November 19, 1920, but were made by defendant in 1921 or later.

This case presents, therefore, a direct conflict of testimony. It is impossible to reconcile the testimony of Payton and Herschoff with the testimony of Gazarra and Rosenthal as to what occurred in this small workshop, employing less than 20 operatives. There is deliberate falsifying on one side or the other. The defense of anticipation involves certain improbabilities: That two inventors separately and independently made the same invention; that a partnership formed with a view of making the improvement of setting the gems from the back should subsequently begin the manufacture of the old type of bracelet, the Walkenheimer, in a small shop employing less than 20 hands; that the bracelets assembled by the J & L Tool Company were of the new style, whose units could not be finally assembled, and not the Walkenheimer bracelet, which could be finally assembled, except the end pieces and catches; that the double strand bracelet was produced and sold nine months before the single strand bracelet.

[2] This seems clearly a case for the application of the well-established rule that, to overcome the presumption of validity arising from the grant of the patent, the defendant must prove its case by tangible proofs, which establish beyond a reasonable doubt the defense of anticipation.

As I am of the opinion that the defendant has not furnished satisfactory proofs of his making the infringing device before the date of the application, November 19, 1920, it becomes unnecessary to review the evidence upon which plaintiff relies to prove reduction to practice by Blanchard on or before July 1, 1920. I am of the opinion that the patent is valid, and that claims 1 to 5, inclusive, have been infringed. The plaintiff is entitled to an injunction, and to the usual reference to a master to determine damages.

A draft decree may be presented accordingly.